IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DEBORAH E. CANNON BOROWKA,    )
                              )
          Plaintiff,          )
                              )
     v.                       )   Civ. No. 04-239-SLR
                              )
JO ANNE BARNHART ,            )
COMMISSIONER, SOCIAL SECURITY )
ADMINISTRATION,               )
                              )
          Defendant.          )

_____

David J. Lyons, Esquire of The Lyons Law Firm, Wilmington,
Delaware.  Counsel for Plaintiff.

Colm F. Connolly, United States Attorney and David F. Chermol,
Special Assistant United States Attorney, United States
Attorney's Office, Wilmington, Delaware.  Counsel for Defendant.
Of Counsel:  Donna L. Calvert, Regional Chief Counsel Social
Security Administration, Philadelphia, Pennsylvania.

_____

**MEMORANDUM OPINION**

Dated:  August .5 , 2005
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

Plaintiff Deborah E. Cannon Borowka filed this action against defendant Jo Anne Barnhart,[1] Commissioner of Social Security, on April 16, 2004.  (D.I. 1)  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a decision by defendant denying her claim for disability income benefits under § 216(i) of the Social Security Act.  (Id.)  Currently before the court are the parties' cross motions for summary judgment.  (D.I. 14)  For the reasons stated below, the court will grant defendant's motion and deny plaintiff's motion.

## II.    BACKGROUND

### A.    Procedural Background

On August 21, 2001, plaintiff filed an application for disability insurance benefits due to back pain, congestive heart failure, angina and kidney problems.  (D.I. 7 at 16-17)  The claim was denied initially and upon review because it was determined that plaintiff's condition was not disabling at anytime prior to March 31, 2000.[2]  (Id. at 16-17, 72)  Plaintiff requested that she receive a hearing before an administrative law

---

[1] Plaintiff filed her complaint against Kenneth J. Apfel, however, Jo Anne Barnhart has since become the Commissioner of Social Security.

[2] The record in this case contains medical records and reports for treatment and diagnoses after March 31, 2000.  This evidence was not considered in this memorandum opinion because it is irrelevant, as plaintiff's burden was to establish a disability prior to March 31, 2000.

judge ("ALJ"); that hearing was held on April 10, 2003.  (D.I. 7

at 16)  On May 28, 2003, the ALJ denied plaintiff's claim.  (Id.

at 23)  The ALJ found the following:

>    1.   The claimant meets the nondisability
>         requirements for a period of disability and
>         Disability Insurance Benefits set forth in
>         Section 206(i) of the Social Security Act and
>         is insured for benefits through March 31,
>         2000.
>
>    2.   The claimant has an impairment or a
>         combination of impairments considered
>         "severe" based on the requirements in the
>         Regulations 20 CFR § 404.1520(b).
>
>    3.   These medically determinable impairments do
>         not meet or medically equal one of the listed
>         impairments in Appendix 1, Subpart P,
>         Regulation No. 4.
>
>    4.   The [ALJ found] the claimant's allegations
>         regarding her limitations are not totally
>         credible for the reasons set forth in the
>         body of the decision.
>
>    5.   The [ALJ] carefully considered all of the
>         medical opinions in the record regarding the
>         severity of the claimant's impairments (20
>         CFR § 404.1527).
>
>    6.   The claimant has the following residual
>         functional capacity: the claimant retained
>         the residual functional capacity to perform a
>         wide range of light exertional activities.
>         Claimant is limited in that she requires the
>         option to sit/stand at intervals of her
>         choosing.
>
>    7.   The claimant is unable to perform any of her
>         past relevant work (20 CFR § 404.1565).
>
>    8.   The claimant is a "younger individual between
>         the ages of 18 and 44" (20 CFR § 404.1563).

9.  The claimant has "more than a high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.20 and 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include unskilled jobs such as office helper, of which there are 550 regionally and 1,300,000 nationally; data exam clerk, of which there are 100 regionally and 10,000 nationally, and charge account clerk, of which there are 450 regionally and 50,000 nationally.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Id. at 22-23).  On February 17, 2004, the Appeals Council declined to review the ALJ's decision and his decision became the final decision of the Commissioner.  (Id. at 5)

**B.  Facts Evinced At The Administrative Law Hearing**

Plaintiff is a 47 year old female who is five foot eight inches tall and weighs approximately 179 points.[3]  (Id. at 38)

---

[3]In the year prior to the ALJ hearing, plaintiff lost about 32 pounds; from 1996 to 2000 she weighed over 200 pounds.  (Id.

Plaintiff lives with her husband, whom she has been living with since 1996.[4]  (Id. at 39, 61)  Plaintiff has completed three and a half years in nursing school and one month of nurses' aide training.[5]  (Id. at 40)

In the past, plaintiff has been employed as a counselor for Horizon, a home for mentally challenged individuals.  (Id. at 40-42)  As a counselor, plaintiff drove the clients to appointments, kept paperwork, ensured that the clients performed chores, ate daily, etc.  (Id. at 42)  Plaintiff has also been employed as a nurses' aide.  (Id.)

In 1996, while in nursing school, plaintiff suffered "an attack or something" (coughing, shortness of breath, dizziness) and was taken to the hospital.  (Id. at 43)  Plaintiff began having chest pains, her feet and legs swelled up and she became "unstable."  (Id.)  Plaintiff was diagnosed with angina.[6]  (Id. at 45)  Plaintiff testified that in 1996 she had surgery to

---

at 38)

[4]Sometime in 1996 plaintiff's employment as a nurses' aide was terminated, she "lost her apartment" and needed a place to stay so she moved in with the man who is now her husband.  (Id. at 61)

[5]Although plaintiff finished about three and a half years of course work, it took her five years due to a leave of absence. (Id. at 40)

[6]"Angina" is "[a] severe, often constricting pain . . . ." Stedman's Medical Dictionary 80 (27th ed. 2002).

remove a growth from her kidney[7] and a hysterectomy.  (Id. at 44,
45)  According to plaintiff, she was seeing Dr. Corrin, a
cardiologist, monthly to address her heart problems.  (Id. at 44)
During this time plaintiff has taking nitroglycerin, Lasix and
Atenolol.  (Id. at 46-47)  All of this made her feel light-
headed, dizzy, tired, confused, swollen and made her lose her
hair.  (Id. at 46-47)  Plaintiff testified that she could not
lift her arms above her head without getting dizzy.  (Id. at 51-
52)  She could not squat, bend over without pain or go up stairs
and had to stop working.  (Id. at 52-53; 397)  Plaintiff
testified further that she has not worked since 1996, when she
tried to resume working but was unable to work more than one
week.[8]  (Id. at 41)

In 1999, plaintiff, a full-time nursing student, dropped
classes to become a part-time student, but eventually had to drop
out of nursing school.  (Id. at 48)  After dropping out of
school, plaintiff spent time going from one doctor or another
getting tested, according to her, about every week and watching
television.  (Id. at 48-49)  In 2000, plaintiff began using a
walker to assist her walking.  (Id. at 54)

---

[7]Plaintiff's medical records indicate she had surgery on her
kidney in 1999 and/or 2000.  (Id. at 192, 295, 296-97)

[8]This date does not coincide with plaintiff's medical
records, which indicate she was given approval to return to work
in 1997.  (Id. at 287-88)

5

At some point, plaintiff began suffering from back pain. (Id. at 44, 57, 63)  Between 1996 and 2000 plaintiff claims she was taking Hydrocote, Percocet and OxyContin and an anti-inflammatory for her back pain.  (Id. at 59)  She began seeing Dr. Labowitz, a rheumatologist, for her back pain.  (Id.)  She testified that in 2000 she was unable to undergo a scheduled back surgery because the anesthesiologist thought it was unsafe for her to be put under anesthesia.  (Id. at 44, 57)  Physical therapy only aggravated her back problems.  (Id. at 57-58)

C.   **Vocational Evidence**

During the administrative hearing, the ALJ called William M. O'Toole, P.h.D. ("Dr. O'Toole"), a vocational expert, to testify about the exertional requirements necessary for plaintiff's prior work experience as a nurses' aide and a Horizon counselor.  (Id. at 64)  Plaintiff's position as a nurses' aide is considered medium exertional level work that is semiskilled, having an SVP level of 4.  (Id. at 65)  Based on Dr. Singh's opinion of plaintiff's capabilities and limitations, there are no SVP level 4 jobs that plaintiff could perform.[9]  (Id. at 66)  There would, however, be jobs available to plaintiff within the range of light capability that included mostly sitting.  (Id. at 66)  These

---

[9]Dr. Singh opined that plaintiff's former job would have an adverse effect on her health.  (Id. at 374)  In fact, he thought that any physical activity, even walking or sitting for an hour, would aggravate her symptoms.  (Id.)

6

include "office helper, data examination clerk, and charge
account clerk," all of which include a substantial amount of
sitting.[10]  (Id. at 66, 67)

### D.  Medical Evidence

In March of 1996, plaintiff had a hysterectomy.  (Id. at
164)  After one day, plaintiff requested to be discharged from
the hospital.  (Id.)  Records indicate that plaintiff was "in
good health" and not experiencing problems with her respiratory
or cardiovascular systems, her kidneys or her back.[11]  (Id. at
165-66).  In March and April of 1996, plaintiff had two chest x-
rays, each showing no active disease.  (Id. at 366)  In May of
1996, plaintiff was admitted to St. Francis Hospital for cardiac
catheterization to evaluate plaintiff's "chest dicomfort and
palpitations."  (Id. at 171)  Plaintiff had a positive stress
test.[12]  (Id. at 171)  After the catheterization the doctor
concluded that plaintiff had "normal coronary arteries," but that

--------

[10]There are 500 office helper positions available
regionally, 1,300,000 available nationally.  (Id. at 66-67)
There are 100 data examination positions available regionally and
10,000 available nationally.  (Id.)  There are 450 charge account
clerk positions available regionally and 50,000 available
nationally.  (Id.)

[11]Although Dr. Singh indicates in some of his records that
plaintiff has suffered from congestive heart failure and chronic
back pain since 1995.  (Id. at 373)

[12]Plaintiff had no history of myocardial infarction; at this
point she had a history of hypertension and signs of
supraventricular tachycardia.  (Id.)

7

she may have "microvascular angina." (<u>Id.</u> at 177)   On November
22, 1996, plaintiff complained to her doctor about having
problems breathing at night.  (<u>Id.</u> at 212)   That same month,
plaintiff underwent a chest x-ray that showed her heart was a
normal size and shape, with no evidence of pneumonic
consolidation or other pathological process.  (<u>Id.</u> at 211)   Dr.
Singh, plaintiff's primary care physician, stated in his
deposition that it is in 1996 that he became aware that plaintiff
was suffering from congestive heart failure.  (<u>Id.</u> at 286)   Her
condition was treated by Dr. Singh with medications, including
Xanax for anxiety.  (<u>Id.</u>)

        Dr. Singh testified via deposition that plaintiff was being
treated for high blood pressure, unstable angina and congestive
heart failure as of February 1997.  (<u>Id.</u> at 286)   According to
Dr. Singh, plaintiff's condition has not improved since he began
treating her.  (<u>Id.</u> at 287)   In May of 1997, plaintiff was
hospitalized and diagnosed with unstable angina and
atherosclerotic cardiovascular disease.  (<u>Id.</u> at 215)   While in
intensive care, plaintiff was on Heparin and intraveneous
nitroglycerin, but both were discontinued when plaintiff left the
hospital against medical advice.[13]  (<u>Id.</u> at 216)   Plaintiff was

_____

        [13]In 1997, plaintiff and her former husband were in the
middle of divorce proceedings.  In the court opinion dividing up
their assets, the court noted that in May of 1997, plaintiff had
a heart attack although it is not clear from the medical evidence
whether plaintiff actually had a heart attack.  (<u>Id.</u> at 393)

advised to return to the hospital immediately if her chest pain
was recurrent and to have an out-patient stress test.  (_Id._ at
228)  The stress test came back negative.[14]  (_Id._ at 232)  After
this plaintiff's medication was switched from Procardia to
Atenolol.  (_Id._ at 235)  This seemed to help her chest
discomfort.  (_Id._)  In June Dr. Singh estimated that, due to her
conditions, plaintiff would be unable to work for six to twelve
months.  (Id. at 160)  In December of 1997, Dr. Singh notified
plaintiff that she could begin working again, as long as she
started with part-time, light-duty work and, if she could
tolerate it, worked up to more strenuous work.  (_Id._ at 287-88)

Early in 1998, plaintiff was again referred to a
cardiologist by Dr. Singh.  (_Id._ at 234)  The cardiologist
concluded that, while plaintiff was not suffering from a cardiac
problem, she probably had bronchitis; the cardiologist intended
to review her chest x-ray and prescribe antibiotics.[15]  (_Id._)
Plaintiff continued taking aspirin, Atenolol and Lasix.  (_Id._)
In March of 1998, she went to the doctor complaining of back pain
resulting in an inability to walk significant distances.  (_Id._ at
269)  In August of 1998, plaintiff had a 24-hour Holter Monitor

---

[14]During the stress test plaintiff was able to exercise on a
treadmill at 65% of the maximum predicted heart rate.  (_Id._ at
236)

[15]The cardiologist indicated that plaintiff was smoking a
pack of cigarettes a day and he would be prescribing Zyban to see
if she could stop smoking.  (_Id._ at 234)

during which time she complained of dizziness, but no associated arrhythmia was identified on the monitor.  (Id. at 278)   During this 24-hour monitoring, plaintiff experienced one episode of angina, but it did not result in any changes to her heart beat or arrhythmia.  (Id.)   In October of 1998, plaintiff began complaining of back pain that she rated as an 8 on a scale of 1 to 10.  (Id. at 256)  Also at this time, plaintiff was experiencing "rusty colored urine."  (Id. at 253)  During much of 1998 plaintiff repeatedly complained of shortness of breath and coughing.  (Id. at 250-75)

In 1999 plaintiff was still complaining of back pain.  (Id. at 203-05, 239)  At first she was given Motrin and back stretching exercises.  (Id. at 239)  On March 2, 1999, a cyst was removed from plaintiff's right kidney.[16]  (Id. at 294, 296-97)  While in the hospital for kidney surgery, plaintiff's chest was X-rayed; it showed no evidence of congestive heart failure.  (Id. at 303)  In June, plaintiff got an MRI of her spine that showed a "concentric annular bulging at L4-5 and . . . disc herniation and possible annualar tear suggesting a more acute process."[17]  (Id.

---

[16]Plaintiff's medical records mention a mass on her kidney and possible kidney disease as early as February 1999.  (Id. at 241)  Also, her medical records indicate that surgery and been scheduled and rescheduled more than once due to plaintiff's respiratory problems.  (Id. at 241-43)

[17]Plaintiff received a second opinion from a former doctor, Dr. Gopez, who agreed with this diagnosis.  (Id. at 320)  This doctor requested that she undergo physiotherapy and take anti-

10

at 307)   Late in 1999 plaintiff went to the doctor twice complaining of chest pain and tightness in her chest.   (<u>Id.</u> at 198-99)

In January of 2000 plaintiff went to the doctor complaining of shortness of breath.[18]   (<u>Id.</u> at 197)

## III. STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive," and the court will set aside the Commissioner's denial of plaintiff's claim only if it is "unsupported by substantial evidence."   42 U.S.C. § 405(g) (2002); 5 U.S.C. § 706(2)(E) (1999); <u>see</u> <u>Menswear Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3rd Cir. 1986).   As the Supreme Court has held,

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Accordingly, it "must do more than create a suspicion of the existence of the fact to be established . . . . It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."

---

inflammatory medication in order to alleviate symptoms without surgery.   (<u>Id.</u> at 320)

[18]Over the next two months plaintiff would return to the doctor two more times complaining of shortness of breath.   (<u>Id.</u> at 194-95)

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting

NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300

(1939)).

The Supreme Court also has embraced this standard as the

appropriate standard for determining the availability of summary

judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold
> inquiry of determining whether there is the need
> for a trial — whether, in other words, there are
> any genuine factual issues that properly can be
> resolved only by a finder of fact because they may
> reasonably be resolved in favor of either party.
> Petitioners suggest, and we agree, that this
> standard mirrors the standard for a directed
> verdict under Federal Rule of Civil Procedure
> 50(a), which is that the trial judge must direct a
> verdict if, under the governing law, there can be
> but one reasonable conclusion as to the verdict.
> If reasonable minds could differ as to the import
> of the evidence, however, a verdict should not be
> directed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)

(internal citations omitted).  Thus, in the context of judicial

review under § 405(g),

> [a] single piece of evidence will not satisfy the
> substantiality test if the [Commissioner] ignores,
> or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence
> substantial if it is overwhelmed by other evidence
> — particularly certain types of evidence (e.g.,
> that offered by treating physicians) — or if it
> really constitutes not evidence but mere
> conclusion.

Brewster v. Heckler, 786 F.2d 581, 584 (3rd Cir. 1986) (quoting

Kent v. Schweiker, 710 F.2d 110, 114 (3rd Cir. 1983)).  Where,

12

for example, the countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Mattel v. Bowen, 926 F.2d 240, 245 (3rd Cir. 1990).

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), as amended, "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." Bowen v. Yuckert, 482 U.S. 137, 140 (1987). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A) (2002).

In Plummer v. Apfel, 186 F.3d 422 (3rd Cir. 1999), the Third Circuit outlined the applicable statutory and regulatory process for determining whether a disability exists:

> In order to establish a disability under
> the Social Security Act, a claimant must
> demonstrate there is some "medically
> determinable basis for an impairment that
> prevents him from engaging in any
> 'substantial gainful activity' for a

13

statutory twelve-month period."   A claimant
is considered unable to engage in any
substantial activity "only if his physical or
mental impairment or impairments are of such
severity that he is not only unable to do his
previous work but cannot, considering his
age, education, and work experience, engage
in any other kind of substantial gainful work
which exists in the national economy."

The Social Security Administration has
promulgated regulations incorporating a
sequential evaluation process for determining
whether a claimant is under a disability.   In
step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity.   If a claimant
is found to be engaged in substantial
activity, the disability claim will be
denied.[19]   In step two, the Commissioner must
determine whether the claimant is suffering
from a severe impairment.   If the claimant
fails to show that her impairments are
"severe", she is ineligible for disability
benefits.[20]

In step three, the Commissioner compares
the medical evidence of the claimant's
impairment to a list of impairments presumed
severe enough to preclude any gainful work.[21]
If a claimant does not suffer from a listed
impairment or its equivalent, the analysis
proceeds to steps four and five.   Step four
requires the ALJ to consider whether the
claimant retains the residual functional

---

[19]It is undisputed that plaintiff is not engaged in gainful
activity.

[20]The ALJ found that plaintiff suffered from three severe
impairments: (1) low back pain; (2) congestive heart failure; and
(3) cardiomegally.   (Id. at 18)

[21]The ALJ found that plaintiff did not suffer from any
impairment equivalent to any of those assumed to be severe enough
to prevent gainful employment.   (Id. at 18)

capacity to perform her past relevant work.[22]
The claimant bears the burden of
demonstrating an inability to return to her
past relevant work.

If the claimant is unable to resume her
former occupation, the evaluation moves to
the final step.  At this stage, the burden of
production shifts to the Commissioner, who
must demonstrate the claimant is capable of
performing other available work in order to
deny a claim of disability.  The ALJ must
show there are other jobs existing in
significant numbers in the national economy
which the claimant can perform, consistent
with her medical impairments, age, education,
past work experience, and residual functional
capacity.  The ALJ must analyze the
cumulative effect of all the claimant's
impairments in determining whether she is
capable of performing work and is not
disabled.  The ALJ will often seek the
assistance of a vocational expert at this
fifth step.

Id. at 427-28 (internal citations omitted).  If the Commissioner

finds that a claimant is disabled or not disabled at any point in

the sequence, review does not proceed to the next step.  See 20

C.F.R. § 404.1520(a) (2002).

The determination of whether a claimant can perform other

work may be based on the administrative rulemaking tables

provided in the Social Security Administration Regulations ("the

grids").  Cf. Jesurum v. Sec'y of Health & Human Servs., 48 F.3d

114, 117 (3rd Cir. 1995) (noting use of the grids for

---

[22]The ALJ concluded that plaintiff could not perform her
previous work as a nurses' aide or a Horizon counselor.  (Id. at
20)

15

determination of eligibility for supplemental social security income) (citing <u>Heckler v. Campbell</u>, 461 U.S. 458, 468-70 (1983)).  In the context of this five-step test, the Commissioner has the burden of demonstrating that the plaintiff is able to perform other available work.  <u>See</u> <u>Bowen</u>, 482 U.S. at 146 n.5. In making this determination, the ALJ must determine the individual's residual functional capacity, age, education, and work experience.  <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(c) (2002).  The ALJ then applies the grids to determine if an individual is disabled or not disabled.  <u>See</u> 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(d) (2002).

If the claimant suffers from significant non-exertional limitations, such as pain or psychological difficulties, the ALJ must determine, based on the evidence in the record, whether these non-exertional limitations limit the claimant's ability to work beyond the work capacity obtained from reviewing the Social Security regulation "grids."  <u>See</u> 20 C.F.R. § 404.1569a(c)-(d). If the claimant's non-exertional limitations are substantial, the ALJ uses the grids as a framework only and ordinarily seeks the assistance of a vocational specialist to determine whether the claimant can work.  <u>See</u> <u>Santise v. Schweiker</u>, 676 F.2d 925, 935 (3rd Cir. 1982); 20 C.F.R. pt 404, subpt. P, app. 2, § 200(d)-(e).

16

**B.    Dr. Singh's Medical Opinion**

Plaintiff contends that the ALJ improperly rejected Dr. Singh's medical opinion that she was disabled prior to March 31, 2000.  Treating physician reports can only be disregarded in the face of contrary medical evidence.  Rosario v. Massanari, No. 00-653, 2001 WL1180279, at *8 (D. Del. Sept. 26, 2001).  Treating physician opinions can, however, be accredited more or less weight depending on the supporting explanations.  See id. at *8. Here, Dr. Singh has stated that plaintiff has recurrent heart disease and back pain that renders her disabled.[23]  The ALJ concluded that Dr. Singh's opinion was "inconsistent with . . . the objective findings in the record prior to" March 2000.  (D.I. 7 at 19)

The medical evidence supports the ALJ's conclusion.  As of March 1996, plaintiff's medical records indicate she was "in good health" and had no cardiovascular problems.  She had two chest x-rays that year, both showed no signs of disease.  Although

---

[23]Dr. Singh filled out a "Medical Impairment Evaluation" form for plaintiff in 2002 in which he stated that plaintiff had been suffering from congestive heart failure, coronary artery disease and chronic back pain since 1995 and that her congestive heart failure and chronic back pain were disabling.  (D.I. 7 at 373)  However, Dr. Singh does not comment on whether or not plaintiff has been disabled since 1995, or just in 2002.  (Id. at 373-80)  Notably, Dr. Singh characterized plaintiff's condition as deteriorating.  (Id. at 376)  From this, the ALJ reasonably concluded that Dr. Singh's statements on this form were not indicative of plaintiff's disability prior to March 2000.  (Id. at 19)

plaintiff had a catheterization and a positive stress test that
year, she seemed to improve after the catheterization.  Dr. Singh
himself even indicated that he did not know plaintiff suffered
from congestive heart failure and unstable angina until late in
1996.  The next year plaintiff had a negative stress test and her
medications began to relieve her chest pain.  She was then
cleared to try working part-time.[24]  In 1999, her chest was x-
rayed and showed no signs of heart disease.  While helping
plaintiff defer her student loans, Dr. Singh indicated that
plaintiff had been disabled since January 2001.  (D.I. 7 at 156)

Plaintiff argues that the opinions of the cardiologists who
treated her show that they also thought she was disabled.  One of
the cardiologists, however, concluded that plaintiff did not have
a cardiac problem, but bronchitis.  Plaintiff had a Holter
Monitor done, which came back negative for any arrythmia.
Furthermore, there is no record of any other doctor finding that
plaintiff was "disabled."  At the most, the medical records from

---

[24]Plaintiff takes issue with the fact that the ALJ relied on
this clearance in concluding that plaintiff was not disabled.
Late in 1997, Dr. Singh told plaintiff she could begin working
part-time because he thought "her condition [had] changed to the
point where she would be able to work."  (Id. at 288)  Plaintiff
testified that she was not able to handle work.  Still, the ALJ
could reasonably have relied on the fact that, in 1997, Dr. Singh
thought plaintiff was well enough to gradually begin working
again as contradicting the position that plaintiff has been
"disabled" since 1995.

her two cardiologists indicate that plaintiff had recurrent symptoms from 1996 to 2001.

With respect to plaintiff's back, her medical records also support the ALJ's conclusion that she was not disabled prior to 1997.  In 1999, Dr. Medinilla, the physician treating plaintiff's back, indicated that her low back pain was "nothing significantly serious."  (D.I. 7 at 316)  A year later she returned to Dr. Medinilla who gave her an injection of Marcaine and Depo-Medrol, which relieved her pain.  (Id. at 315)  After the injection, "[t]here was no evidence of focal weakness, atrophy or fascinculations . . . ."  There was "[s]ensation to pin prick, touch and temperature was normal.  The reflexes were briskly reactive and symmetrical.  The range of motion of the dorsolumbar spine was full . . . ."  (Id.)  After this visit, Dr. Medinilla concluded that he would not need to see plaintiff regularly and that she should take Celebrex and Tylenol for the pain.  (Id.) It was not until June 2001, after the date of disability at issue in this case, that Dr. Medinilla recommended that plaintiff undergo back surgery.  (Id. at 314)

In this case, the ALJ properly discounted Dr. Singh's opinion that plaintiff was disabled as of March 1995 because the opinion was unsubstantiated by the record.

C.    Plaintiff's Complaint's Of Pain And Medical Side
      Effects

Plaintiff argues that the ALJ did not appropriately consider

her subjective complaints with respect to pain and the side

effects of her numerous medications and, had he done so, would

have found her disabled prior to March 2000.  When evaluating a

plaintiff's complaints of pain, the ALJ is to consider whether

plaintiff's subjective complaints are consistent with, and

supported by, objective medical evidence.  See 20 C.F.R. §

404.1529(a),(c)(3)-(4).  Because the ALJ must conclude that a

medical impairment is reasonably causing the symptoms and then

evaluate the intensity of the symptoms, he must evaluate the

plaintiff's ability to accurately describe her pain.  Rosario v.

Massanari, No. 00-653, 2001 WL1180279, at *9 (D. Del. Sept. 26,

2001).

In this case, the ALJ found plaintiff's testimony regarding

her pain and the side effects to be "exagerrated."  (D.I. 7 at

19)  The ALJ further found that there was no medical

corroboration for plaintiff's complaints of the adverse side

effects of her medication and that the medical records indicated

only "moderate physical symptoms."  (Id.)  Plaintiff has failed

to cite any medical evidence supporting her complaints with

respect to her medications.  There is only one reference to a

change in her medications; in 1997 plaintiff was successfully

switched from Procardia to Atenolol.  (Id. at 235)  This one

reference is not enough from which to conclude that plaintiff's medications rendered her disabled, or that her medications when coupled with her medical conditions rendered her disabled. Likewise, there is no medical evidence to support plaintiff's claims of debilitating pain.  While there is evidence of a medical basis for plaintiff's pain, plaintiff failed to cite evidence that her pain was as significant as she claimed.  There are numerous accounts of complaints of pain and a diagnosis of angina (i.e., pain in her chest), but no medical evidence of pain so significant it is debilitating.[25]  Therefore, the ALJ's conclusion that plaintiff was exaggerating her pain, and that the pain did not render her disabled was not contradictory to the weight of the medical evidence.

**V.   CONCLUSION**

For the reasons stated, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.  An order consistent with this memorandum opinion shall issue.

---

[25]Notably, Dr. Singh cleared plaintiff to try to return to work even after her angina diagnosis.

21